## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALLEN EDWIN CARTER             :

                                :

    v.                           :            Civil No. CCB-04-3065

                                  :

MARYLAND AVIATION         :

ADMINISTRATION, et. al.       :

### MEMORANDUM

Now pending before the court is the defendants' motion for summary judgment.  The issues have been fully briefed and no hearing is necessary. Local Rule 105.6. For the reasons that follow, the defendants' motion will be granted.

### BACKGROUND

Plaintiff Allen Edward Carter ("Carter"), a 53 year-old African-American, has been employed by defendant Maryland Aviation Administration ("MAA") and the Maryland Department of Transportation ("DOT") since 1982.  He began his career with the state at a grade level 10.  Through 28 years of employment he has never been promoted above a grade 11/12 despite, Carter alleges, always performing his work in a satisfactory manner. Carter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 13, 2003.  On June 29, 2004, Carter received his right to sue letter from the EEOC, and he filed this action on September 24, 2004.[1]  Totaling sixteen "counts," Carter alleges

---

[1] Carter brought suit against the State of Maryland, the MAA, DOT, Daniel Consultants, Inc., and the following individuals, all employees of the MAA, in their individual capacities: Dianne Walker, Paul Wiedefeld, Joseph Nessel, Benjamin Chin, Ali Logmanni, and Mehrzad Rouhani. The court dismissed all claims against Daniel Consultants, Inc. in its May 6, 2005 opinion. *See Carter v. Maryland Aviation Admin.*, 2005 WL 1075328, *1 (D.Md. 2005)(unreported). Additionally, to the extent Carter brought any of his Title VII claims against

multiple acts of discrimination on the part of his employer.[2]  Essentially, Carter contends that his race was the basis for, *inter alia*, his employer denying him training, timely and good faith evaluations, reclassifications, and promotions, and that he was retaliated against for complaining of the same.[3]  Carter further alleges that the MAA has a policy, custom or practice of this type of discrimination against other similarly situated African-American employees.

Although his specific contentions are far more voluminous, the particular issues or instances Carter identifies include: his employer's failure to use the standard Position Appraisal Method ("PAM") in performing his evaluation, as is routinely done when considering reclassifications; the failure to consider, or "substitute," his years of experience in determining whether a reclassification was warranted; that he was sent to only two training conferences in

the individual defendants in their personal capacities, those claims were dismissed.

[2] Specifically, Carter alleges twelve federal claims and four pendent state law claims. These "counts," as styled by Carter, are: Count I - Title VII (Unlawful Race Discrimination); Count II - Title VII (Unlawful Sex Discrimination); Count III - Unlawful Retaliation (Title VII); Count IV - Title VII Hostile and Abusive Work Environment (based on race); Count V - Unlawful Age Discrimination (ADEA); Count VI - Due Process Violation (42 U.S.C. § 1983); Count VII - Equal Protection Violation (42 U.S.C. § 1983); Count VIII - Violation of [the] First Amendment  (42 U.S.C. § 1983); Count IX - Civil Conspiracy  (42 U.S.C. §§ 1983 and 1985(3)); Count X - Failure and Neglect to Prevent Conspiracy (42 U.S.C. §§ 1983 and 1985(3)); Count XI (Race-based discrimination) 42 U.S.C. § 1981; Count XII (Race-Based Retaliation) 42 U.S.C. § 1981; Count XIII - Intentional Infliction of Emotional Distress; Count XIV - Intentional Misrepresentation; Count XV - Breach of Contract; Count XVI - Negligence. Seven of these counts were dismissed, some only in part, by this court in its May 6, 2005 opinion. *See Carter*, 2005 WL 1075328 (unreported)(dismissing Counts V, IX, X, XIII, XIV, XV, and XVI). To the extent Counts XIV (Intentional Misrepresentation) and XV (Breach of Contract) were brought against the individual defendants in their personal capacities, those counts were not dismissed against the individual defendants. Additionally, Carter's various Title VII, 42 U.S.C. § 1981, first and fourteenth amendment claims remain.

[3] At various points and to a lesser extent than his claims of racial discrimination, Carter also argues that his age and gender were additional bases for the treatment he received. Carter's age discrimination claim under the ADEA, however, has already been dismissed by this court.

over two decades, while others received far more training, thus rendering him less competitive

for promotions; irregularities in the promotion of Mehrzad Rouhani and Randall Dickinson

which Carter contends are evidence of discrimination; the use of informal selection procedures

that limit African-Americans' competitiveness; the defendants' pre-selection of white applicants

and employees for training before job vacancies become generally known; the denial of his

overtime requests; and being the victim of intentional isolation at the workplace as retaliation for

complaining about his treatment.  As a result of the discriminatory and unlawful acts by the

defendants, Carter alleges that he has "suffered damages, including, but not limited to loss of

promotion, loss of reputation, emotional distress, loss of weight, loss of income, and

embarrassment."

      In turn, defendants, citing multiple grounds which will be taken up below, argue that

summary judgment is appropriate and Carter's claims must fail.  As further explained below, the

court agrees.

**<u>ANALYSIS</u>**

**A.**

      Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

3

*genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted)(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).[4]

## B.

Carter's various claims must fail.[5]  In addition to being partially barred by the relevant

---

[4] Courts must take special care when considering a motion for summary judgment in an intentional discrimination case because motive is often the critical issue. Summary judgment disposition remains appropriate, however, if the plaintiff cannot prevail as a matter of law. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

[5] As discussed in note 2, *infra*, to the extent Counts XIV (Intentional Misrepresentation) and XV (Breach of Contract) were brought against the individual defendants in their personal capacities, those counts were not dismissed in this court's May 6, 2005 opinion. Those counts, however, will now be dismissed. Carter's claim of intentional misrepresentation is without merit. Putting aside that Carter, in his deposition, cannot substantiate that anyone ever actually made the claimed representations to him (*See* Def's Mot. for Summ. J., Exhibit 1, Carter Depo. at 1547-1580), Carter puts forth nothing that even arguably meets the requirements of making out such a claim. *See Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424,

statute of limitations,[6] many of Carter's claims cannot survive summary judgment because Carter

fails, as required under the various anti-discrimination laws, to allege consequences which

amount to an adverse employment action.  In any event, in none of the claims does Carter put

forth enough evidence to rebut the defendants' proffered legitimate non-discriminatory reasons

for their actions, or to raise any inference that proscribed animus was at play.  Moreover, the

alleged acts that form the basis of Carter's claims under the first and fourteenth amendments do

not rise to the level of cognizable constitutional harms.

*Constitutional claims*

42 U.S.C. § 1983 provides a remedy for "the deprivation of any rights, privileges, or

immunities secured by the Constitution." Carter alleges that defendants' actions deprived him of

---

444-45 (4th Cir. 2001)(citing *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994)). Carter's
breach of contract claim fails because there was no written contract here. *See Mass Transit
Admin. v. Granite Const. Co.*, 471 A.2d 1121, 1128 (Md. 1984)(holding that no matter how
meritorious a claim based upon an implied contract may be, if that claim is against the state or
any of its agencies, it is barred because it is not based upon a written contract); (*See* Def's Mot.
for Summ. J., Exhibit 1, Carter Depo. at 1556-1558).

[6] Due to the limitations imposed by 42 U.S.C. § 2000e-5(e)(1)(a discrimination charge
must be filed with the EEOC within 300 days of an alleged unlawful employment practice),
some, but not all, of Carter's claims under Title VII are time barred. Carter's 42 U.S.C. § 1981
claims based on the same acts, however, are not barred, and thus the allegations must be
addressed in any event. *See White v. BFI Waste Services, LLC*, 375 F.3d 288, 291-92 (4th Cir.
2004)(citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)(§ 1981 claims must
be brought within four years of the occurrence of the challenged action).  Additionally, many of
Carter's claims, including his § 1983 claims, his Title VII and § 1981 claims of retaliation for
filing an EEOC charge, his hostile work environment claims, and his denial of training claims,
are not time barred under any of the statutes. *See, e.g., Nealon v. Stone*, 958 F.2d 584, 590 (4th
Cir. 1992)(plaintiffs may raise retaliation claims for the first time in federal court); *see also
White*, 375 F.3d at 293 ("[hostile work environment] claim may appropriately extend even to
acts that occurred before the relevant limitations period, because the hostile work environment
continued within the limitations period as well.").

rights secured by the first amendment and the fourteenth amendment's equal protection and due

process clauses. The alleged acts that form the basis of Carter's constitutional claims, however,

do not rise to the level of cognizable constitutional harms.

First, in order to prove a first amendment violation in an employment context such as

this, a public employee must establish, *inter alia*, that he or she spoke out on a matter of public

concern. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 246-47 (4th Cir.1999). "When a

public employee speaks not as a citizen upon matters of public concern, but instead as an

employee upon matters of personal interest, absent the most unusual circumstances," such

speech is not protected. *DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995)(quoting *Connick

v. Myers*, 461 U.S. 138, 147 (1983)). The speech for which Carter seeks protection is a complaint

about his lack of opportunities for development and promotion. Whether or not he was raising

valid concerns, such speech was made as an employee upon matters of personal interest and is

not protected.[7]

Carter's fourteenth amendment claims are similarly unavailing. In order to establish a

due process violation arising out of the loss of a job or promotion, a plaintiff must first show that

he or she had a property interest in the position. *See Wineland v. Cnty. Commrs. of Dorchester

Cnty.*, 892 F.Supp. 719, 721 (D.Md. 1995)(citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569

(1972); *and Leese v. Baltimore Cnty.*, 497 A.2d 159, 166-67 (Md. App. 1985)). A government

employee can establish a property interest in a job by showing a guarantee of continued

---

[7] While a policy of discrimination on the part of a public agency could potentially be a
legitimate matter of public concern, that does not bring this situation under the protection of the
first amendment. *See DiMeglio,* 45 F.3d at 805 (quoting *Terrell v. Univ. of Texas Sys. Police*,
792 F.2d 1360, 1362 (5th Cir. 1986)("...almost anything that occurs within a public agency *could*
be of concern to the public...").

employment or promotion.  *Wineland*, 892 F.Supp. at 721(citing *Leese*, 497 A.2d at 167).  Carter

has presented no argument or evidence suggesting that he had a "legitimate claim of entitlement"

to the promotions he was denied. *See Roth*, 408 U.S. at 577.  There is no reason, therefore, that

the general rule under Maryland law - that state employees are employed at will and have no

property interest in their employment or promotion - should not apply here. *See Bowers v. Town*

*of Smithburg*, 990 F.Supp. 396, 398 (D.Md. 1997)(citing *Leese*, 497 A.2d at 167). Putting aside

that the procedures the defendants followed and the consideration they gave to Carter's concerns

appear to have been completely consistent with the due process of law, Carter has not alleged

any "property interest" which would be accorded protection under the due process clause.[8]


*Denials of training, reclassification and promotion - Title VII and § 1981*

With the goal of "progressively...sharpen[ing] the inquiry into the elusive factual

question of intentional discrimination," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.

248, 255, n. 8 (1981), the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411

---

[8] To the extent that Carter is alleging a deprivation of a liberty interest, such a claim must similarly fail. While a liberty interest has been recognized in an employment setting when the dismissal imposes a "stigma or disability that forecloses other employment opportunities," *see Roth,* 408 U.S. at 573, nothing Carter alleges rises to this level.  *See Leese*, 497 A.2d at 168-70 (emphasizing the severity of the stigma required to make out a deprivation of liberty interest in this context).  As for Carter's equal protection claim, it appears that he is alleging intentional racial discrimination based on the same incidents and accusations as he raises in his Title VII and § 1981 claims. As addressed more thoroughly in the following section evaluating his Title VII and § 1981 claims, Carter cannot establish the elements necessary to make out a case of intentional racial discrimination and, therefore, his equal protection claims must fail as well.  *See Whiting v. Jackson State University*, 616 F.2d 116, 121-22 (5th Cir. 1980)("In order to establish a violation of the equal protection clause, the plaintiff must prove a racially discriminatory purpose or motive" and "insofar as it is used as a parallel remedy under § 1981 and [Title VII], the elements of the causes of action do not differ").

U.S. 792 (1973), established the now well known allocation of the burden of production and an

order for the presentation of proof in Title VII discriminatory treatment cases. The plaintiff must

first establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *See St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).[9]  If the *prima facie* case is established,

the burden then shifts to the employer to produce evidence that the employment decision was

made for legitimate, nondiscriminatory reasons. *See Burdine*, 450 U.S. at 254. Once the

employer produces sufficient evidence to support a nondiscriminatory explanation for its

 decision, the plaintiff must be afforded the opportunity to prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were

a pretext for discrimination. *See St. Mary's Honor Center*, 509 U.S. at 507-508.  The *prima facie*

case, combined with sufficient evidence to find that the employer's asserted justification is false,

may permit the trier of fact to conclude that the employer unlawfully discriminated, but may not

always be adequate to sustain a jury's finding of liability. *See Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 142 (2000)("Certainly there will be instances where, although the

plaintiff has established a prima facie case and set forth sufficient evidence to reject the

---

[9] To establish a *prima facie* case of discriminatory denial of promotion, which is also essentially what the "reclassifications" are in this case, the plaintiff ordinarily must show that: (1) he is a member of a protected group; (2) the defendant had an open position for which the plaintiff applied; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of discrimination. *See Janey v. N. Hess Sons, Inc.*, 268 F.Supp.2d 616, 621-22 (D.Md. 2003)(citing *Evans v. Technologies Applications and Serv., Co.*, 80 F.3d 954, 959-60 (4th Cir.1996)).  To establish a *prima facie* case of discriminatory denial of training, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination. *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002)(citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir.1998).

defendant's explanation, no rational fact-finder could conclude that the action was discriminatory.").

Flexible enough to be adapted for the circumstances of the allegations, this general framework applies to both denial of training and denial of reclassification or promotion claims, as well as to Carter's Title VII and his 42 U.S.C. § 1981 and § 1983 claims.  *See Gairola v. Commonwealth of Virginia Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985); *Whiting v. Jackson State University*, 616 F.2d 116, 121-22 (5th Cir. 1980). With this framework in mind, the court takes up Carter's remaining claims of discrimination.[10]

Even assuming that Carter has made out the other elements of a *prima facie* case of discrimination, he has failed to make the threshold showing that he was qualified for the reclassification requested or the Document Management position.[11]   Moreover, even if Carter

---

[10] As a threshold issue, the defendants argue that the actions complained of are not "adverse employment actions," as required to make out a *prima facie* case. While many of the actions Carter points to as being retaliatory do not rise to the level of adverse employment actions, denials of  reclassifications and promotions, and even negative performance evaluations, all of which may lead to the denial of pay increases, may constitute adverse employment actions. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004)(holding that a negative performance evaluation itself could affect a term, condition, or benefit of employment if the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of that employment)(citing *VonGunten v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001).  Additionally, it is possible that denial of training opportunities, if it adversely affects the terms, conditions, or benefits of employment, could amount to an adverse employment action. *See Potomac Electric Power Co.*, 312 F.3d at 650-51 (rejecting, but not ruling out, denial of training as an adverse employment action because plaintiff in that case produced no evidence that the lack of training bore any impact on the terms and conditions of employment). As I find that Carter's claims fail on other grounds, I will assume, without deciding, that the adverse employment action element of Carter's  *prima facie* case on this subset of claims is met.

[11] Uncontroverted evidence shows that Carter was not qualified for the Document Management position. As further explained below, Carter's performance on the relevant scoring system fell far short of those of the interviewed candidates. (*See Def's Mot. for Summ. J., Exhibit 12, Logmanni Depo. at 92-94; Plf's Opp'n, Depo. Exhibit 5B, Annotated Candidate

did make out a *prima facie* case of discrimination, he has presented nothing that would rebut the legitimate nondiscriminatory reasons defendants have put forward to explain the denial of training opportunities, the 2002 reclassification, and the promotion to the Document Management position.

With respect to the selection of Rouhani, instead of Carter, for the Document Management position, defendants have stated that in order to select applicants to be interviewed, a scoring system was created which allotted points for degree obtained, degree in progress, GIS experience, EDMS experience, GIS/EDMS education, AutoCADD experience, certifications, supervisory experience, and current position.  (*See* Def's Mot. for Summ. J., Exhibit 12, Logmanni Depo. at 84-97)[12]  The seven highest scoring applicants scored between 65 and 38 points. (*See* Def's Mot. for Summ. J., Exhibit 12, Logmanni Depo. at 84-97; Plf's Opp'n, Depo. Exhibit 5B, Annotated Candidate Scores)  Carter scored a 22.  (Id.)  Rouhani has a Masters degree; Carter a Bachelors of Arts. (Id.)  Rouhani also had more supervisory experience. (Id.)

-----

Scores). Moreover, Carter had far less supervisory experience. (Id.) For the same reasons more thoroughly discussed in assessing the defendants' asserted legitimate non-discriminatory reasons for the denials, the defendants also have demonstrated that the requested reclassification was not appropriate.  (*See* Def's Mot. for Summ. J., Exhibit 3, Carter 2002 Reclassification).  With respect to the denied training opportunities, Carter was not qualified for some of what he requested, but was denied the training primarily for other reasons. The denial of training opportunities is further addressed below. To the extent that this court, in its May 6, 2005 opinion, held that Carter had satisfied each prong of the *prima facie* case under Count I, that holding has no effect on the opinions expressed here. In finding that Carter had stated a claim in the May 6, 2005 opinion, the court, in an attempt to coherently address Carter's wide-ranging claims of discrimination, assessed Carter's claim under a more general *prima facie* standard.  In light of further development of the parties' positions at summary judgment, it is clear that under Count I, Carter is primarily challenging the denial of reclassifications, promotion, and training.

[12] Carter's Title VII claim based on the Document Management position is barred by the statute of limitations. Carter's § 1981 claim based on this occurrence, however, is not.

The defendants maintain that Carter was not selected for an interview solely because he did not fall into the necessary point range. Carter has produced nothing to suggest that this stated reason is pretext, and nothing to suggest his race was an issue.[13]

As for the reclassification Carter challenges, defendants have put forward credible evidence that the reclassification requested was not appropriate.[14]  Carter is currently a

---

[13] Defendants make the argument that Carter's and Rouhani's qualifications are so disparate that Carter cannot be said to be similarly situated to Rouhani, and thus fails to even make out a *prima facie* claim.  Defendants are correct that, generally, to give rise to an inference of discrimination, one must demonstrate that he or she was denied training or positions given to other similarly situated employees who were not members of the protected group. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *see also Pafford*, 148 F.3d at 667.  The defendants' argument is not without force. The "burden of establishing a *prima facie* case of disparate treatment is not onerous," however,  *Burdine*, 450 U.S. at 253, and Carter has identified White employees who were granted reclassifications or promotions.  The court will assume, therefore, without deciding, that Carter has satisfied this aspect of his *prima facie* case, although it is admittedly weak. *See Evans,* 80 F.3d at 960 ("While the evidence creates a close call...'the burden of establishing a *prima facie* case of disparate treatment is not onerous'...[and] [t]hus, for purposes of this appeal, we find that Evans has satisfied the 'relatively easy test' of showing that she...was rejected under circumstances which give rise to an inference of unlawful discrimination).  The evidence put forth that they were not similarly situated, however, further supports the defendants' legitimate non-discriminatory explanation for its actions. Carter was far less qualified than Rouhani, who got the position, and the other interviewed candidates.

[14] Defendants again make the argument that Carter's qualifications are so disparate from those of the "comparators" he identifies that Carter cannot be said to be similarly situated to any of them, thus failing to even make out a *prima facie* claim. Again, the court will assume, without deciding, that Carter has satisfied this aspect of his *prima facie* case. *See Evans,* 80 F.3d at 960. The evidence put forth that they were not similarly situated, however, further supports the defendants' legitimate non-discriminatory explanation for its actions. For example, Carter points to various other employees who received reclassifications.  Mary Lou Spake performs professional administrative staff work which is not at all similar to Carter's duties. (*See* Def's Mot. for Summ. J., Exhibit 5, Spake Reclassification)  Similarly, Wayne Johnson's primary duties are construction management, and inspection of building and installation permits.  (*See* Def's Mot. for Summ. J., Exhibit 9, Johnson Reclassification)  Carter does not perform any of these functions. Moreover, defendants have stated, and Carter has not rebutted, that Johnson's most recent reclassification request also was denied. (Id.) Defendants also contend that Carter is not similarly situated to Emory Carrigan, the Assistant Manager of Facilities Construction, who is responsible for the oversight, administration, and management of MAA's $1.2 billion Capital

Transportation Engineering Technician III ("TET III"). Carter applied for a reclassification to

TET V in 2002, the denial of which he is challenging. (*See* Def's Mot. for Summ. J., Exhibit 3,

Carter 2002 Reclassification)  Human Resources received the request in September of 2002 and

informed Carter that it would conduct a study of his position and compare it to the duties

required to advance to TET V level.[15]  (Id.)  Ms. Walker, of the Classification and Compensation

Unit, determined that the TET V position requires, *inter alia*, that the candidate function at the

advanced technical or senior project management level, or as a project engineer for large

projects, or serving as an assistant project manager. (Id.)  She further found that Carter had not

competed any TET V level duties, nor does Carter even allege as much, either here or in his

original "position description" submitted with his application for reclassification. (*See* id.)

_____

Construction Program. (*See* Def's Mot. for Summ. J., Exhibit 7, Position Description)  Carter and Carrigan share no common tasks.

[15] Carter does highlight one issue in relation to his reclassification request which raises some questions. Defendants do not seem to contest that the Position Analysis Method ("PAM") is commonly used to perform reclassification reviews. (*See* Plf's Opp'n, Exhibit 18, Walker Depo. at 38-41) Carter emphasizes, and defendants do not contest, that the PAM was not utilized in assessing Carter's request for reclassification. (Id.)  Departures from established, standardized evaluation procedures should normally raise concern, as more informal methods may leave the door open to arbitrary or discriminatory decision-making. Here, however, defendants have stated that the MAA is not required to use the PAM for TET reclassification requests. (*See* Def's Reply, Exhibit 22, Walker Aff.)  Additionally, in order to establish its specifications, the entire TET series was previously assessed as a group using the PAM, something the defendants were presumably able to draw upon for future requests, including Carter's. (*See* id.)  Moreover, defendants have presented evidence that other reclassification requests, including ones to which Carter points as comparators, were analyzed not using the PAM. (*See* Def's Mot. for Summ. J., Exhibit 6, Dickinson Reclassification)  In any event, in addition to the defendants' persuasive explanation of why Carter's reclassification was handled in such a manner, Carter fatally fails to offer any evidence that utilization of the PAM would have affected the terms and conditions of his employment or, for that matter, made any difference at all.  The "classification method," which was used in assessing Carter's request, is also a standard tool utilized by the Classification and Compensation Section, (*See* Def's Reply, Exhibit 22, Walker Aff.), and Carter presents no evidence that it is deficient.

Ultimately, Walker determined that Carter was appropriately classified.[16]  (Id.)  Carter, in turn, is

unable to rebut this legitimate non-discriminatory explanation for the denial.  He points to

nothing which would suggest the explanation is mere pretext.[17]

As for the denial of training opportunities, defendants again put forth legitimate non-

discriminatory reasons which Carter has failed to rebut.  Concerning Carter's request for GIS

training, defendants have testified that MAA was not yet using the GIS product, that funding for

future GIS use was uncertain, and that sending anyone to such training would be premature. (*See*

---

[16] Carter previously requested a reclassification in 1999. (*See* Def's Mot. for Summ. J.,
Exhibit 2, Carter 2000 Reclassification) The job analysis which was conducted at that time
further demonstrates why the 2002 denial was appropriate and undercuts a contention that
defendants were denying Carter reclassifications for discriminatory reasons.  Before his current
classification of TET III, he was an Engineering Technician IV ("ET IV").  (*See* id.)  In 1999, a
request for reclassification was submitted for Carter, asking that he be reclassified to an AT II.
(Id.)  Finding, *inter alia*, that Carter's position "is not required to develop initial concepts,
specifications or perform cost estimates," Ms. Porter of the Classification and Compensation
Unit determined that an AT classification would be inappropriate. (Id.)  She did recommend, and
Carter was granted, a reclassification to the then newly approved classification of TET III.  (Id.)
In thoroughly assessing the 2002 reclassification request at issue, Walker found that Carter's
duties had remained essentially the same since the previous job study, thus supporting the
conclusion that his position remained properly classified. (*See* Def's Mot. for Summ. J., Exhibit
3, Carter 2002 Reclassification)  This is not an organization making the seemingly arbitrary or
uncritical decisions which raise concerns that discrimination may be influencing the process.

[17] Attempting to raise an inference of discrimination, Carter emphasizes the
reclassification which was granted in 2000 to Dickinson, who is Caucasian. Carter further claims
that Dickinson's application was falsified. Carter argues that granting the reclassification, while
denying his request, despite the defendants' knowledge that Dickinson's application was
falsified, is further evidence of discrimination. Defendants have offered a legitimate non-
discriminatory explanation for the reclassification granted to Dickinson. (*See* Def's Mot. for
Summ. J., Exhibit 6, Dickinson Reclassification)  A study of Dickinson's position was conducted
and the request appears to have been thoroughly considered and scrutinized. (Id.)  In fact,
Dickinson was granted a different reclassification from that which he requested. (Id.) Moreover,
the study of Dickinson's position, along with the study of Carter's position, confirm that they do
not at all have the same responsibilities or duties, thus diminishing any inferences that can be
drawn from comparing the two.

Def's Mot. for Summ. J., Exhibit 11,  Rouhani Depo. at 87-89; *see also* Exhibit 16, Rouhani Aff. at ¶3)  As for the request for AutoCADD 2004 training, Rouhani explained to Carter that the request was denied because the standards were still in development.  (*See* Def's Mot. for Summ. J., Exhibit 1, Carter Depo. at 90-91)  Carter does not contest this explanation, but rather asserts, without support, that Rouhani delayed final approval of the standards in order to deny Carter the training. Without further substantiation, such a contention lacks credibility.  Carter also requested Project Information Management Systems  ("PIMS") training. Carter avers that Rouhani told him there were problems with the software. (Id. at 99-103)  Carter offers nothing more to rebut Rouhani's explanation.  Finally, Carter was told that his requests for project management training and "Smart Start" training were denied because he did not function as a project manager and did not supervise other employees. (Id. at 106, 128-130)  Carter again offers nothing to challenge these legitimate explanations.[18]  In none of the above instances has Carter presented enough to rebut the legitimate non-discriminatory explanations give by the defendants.

Accordingly, Carter's claims based on his evaluations and denials of training, reclassification and promotions must fail.[19]

_____

[18] With respect to the "Smart Start" training, Carter appears to be challenging only his initial denial, as he was later approved for the training after Human Resources clarified earlier confusion resulting from internal reorganizations. (*See* Def's Mot. for Summ. J., Exhibit 16, Rouhani Aff. at ¶3)  Additionally, Carter challenges the denial of his request for "Perceptive Leadership" training.  While he again makes the claim that the request was initially denied, Carter admits that he was approved for this training in 2004. (*See* Def's Mot. for Summ. J., Exhibit 1, Carter Depo. at 152; *see also* Def's Mot. for Summ. J., Exhibit 11, Rouhani Depo. at 111)

[19] Carter also alleges that he was subjected to these various instances of discriminatory treatment on the basis of his gender. Carter presents no evidence whatsoever giving rise to any

*Title VII and § 1981 retaliation claims*

To establish a *prima facie* retaliation claim, Carter must produce evidence from which a reasonable jury could find (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.2004). Adverse employment actions may include any retaliatory act or harassment, if that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment. *Von Gunten v. Maryland,* 243 F.3d 858, 865-68 (4th Cir.2001)(citing *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 242 (4th Cir.1997). The protected activity to which Carter points is his filing of a charge of discrimination with the EEOC on November 13, 2003, and earlier discussions in July of 2003 with MAA leadership about the discrimination he felt he was experiencing. (*See* Plf's Opp'n to Summ. J., Exhibits 11 and 12, Correspondence)

The alleged retaliatory acts to which Carter points do not include the denials of reclassifications or promotions, as those acts occurred before his alleged "protected activity." *See Nichols v. Comcast Cablevision of Maryland*, 84 F.Supp.2d 642, 658, 21 (D.Md. 2000). Rather, the alleged retaliatory acts to which he points are the intentional falsification of his

---

inference of discrimination on the basis of sex. Carter attempts to show that he was similarly situated to various women who received favorable promotions and reclassifications, including Mary Lou Spake. As with Spake, Carter also is not similarly situated to Ms. Schonowski, who is a Procurement Administrator I, or Ms. Hubbard, who is an Administrative Officer I. (*See* Def's Mot. for Summ. J., Exhibit 5, Spake Reclassification; Exhibit 10, Schonowski Reclassification; Exhibit 8, Hubbard Reclassification) None of these individuals' responsibilities are remotely similar to the tasks Carter performs. Moreover, as previously explained, Carter has not demonstrated that he was qualified for the reclassification. Carter fails, therefore, to establish a *prima facie* case of sex discrimination. And in any event, as with his claims of racial discrimination, Carter has failed to show that the legitimate non-discriminatory reasons given for the defendants' actions are pretext for proscribed sex-based discrimination.

records; the compilation of "write-ups" to lay the foundation for an adverse employment action;
intentional targeting for monitoring, harassment, and intimidation; delayed completion of his
"efficiency rating," leading to a delayed 2003 evaluation; the intentional falsification of the 2003
evaluation; and the concerted isolation of Carter through instructing staff not to consult with or
contact him. Carter offers little more than bare accusations that many of these acts even
occurred, *see Mackey*, 360 F.3d at 469-70 ("A plaintiff's own self-serving opinions, absent
anything more, are insufficient to establish a prima facie case of discrimination"), but in any
event, none rise to the level of an adverse employment action that could serve as the basis for a
retaliation claim under either Title VII or § 1981. *See Nichols,* 84 F.Supp.2d at 658-59
(emphasizing the level to which such actions must rise); *see also Skipper v. Giant Food, Inc.*,187
F.Supp.2d 490, 493-94 (D.Md. 2002)("He does not allege that, beyond his perception that they
were unfair, any of these actions adversely affected a term, condition, or benefit of his
employment, and courts have not typically held such actions to satisfy this requirement.").
Carter seems to argue that some of these actions could lead to, or lay the foundation for an
adverse employment action, but such speculation about the impact of these acts "are merely that
- stark assertions that are not sufficient to survive summary judgment." *See Booz-Allen*, 368 F.3d
at 377 (citing *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 135 (4th Cir.2002).[20]

---

[20] A negative performance evaluation, when used "as a basis to detrimentally alter the
terms or conditions of the recipient's employment," can be an actionable adverse employment
action. *See Von Gunten,* 243 F.3d at 867 (citing *Spears v. Missouri Dep't of Corr. & Human
Res.*, 210 F.3d 850, 854 (8th Cir.2000)). Carter asserts only that the evaluation was delayed and
falsified, but offers no discernable elaboration on whether, and in what way, the evaluation was
negative, and does not allege that it actually affected the terms and conditions of his
employment.  In fact, the cited performance evaluation, while a two point decrease from his
previous score, still resulted in a "meets standards" conclusion. (*See* Def's Mot. for Summ. J.,
Exhibit 4, Carter Performance Evals.)  Carter offers no explanation of how a "meets standards"

*Title VII hostile work environment claims*

Carter's final remaining claim is his Title VII hostile work environment claim. To state a claim for hostile work environment, Carter must show that: (1) the harassment was unwelcome; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).  Among other problems with this claim, Carter has failed to show that the harassment was based on his race or that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. As with his claim of retaliation, Carter points to several acts which he claims created the hostile work environment, most of which are the same acts he has challenged in the other "counts" of his suit.[21]

While it is conceivable that these types of acts, especially if taken together, could create an environment  sufficiently severe or pervasive to create a hostile work environment, they do not rise to that level here.  None of the acts, even as Carter has described them, would create an abusive environment. *See, e.g., Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir.

---

evaluation could adversely affect the terms and conditions of his employment.

[21] Specifically, in making his hostile work environment claim, Carter appears to be relying on his accusations that: he was intentionally targeted for monitoring, harassment, and intimidation; his supervisors delayed completion of his "efficiency rating," leading to a delayed 2003 evaluation; there was a concerted effort to isolate Carter through instructing staff not to consult with or contact him; his workload was increased; racial slurs were made, including accusing Carter of being "interested in colors," in reference to his complaints; and that his PIN was taken away.  Additionally, Carter incorporates his challenges to the denials of training, reclassification, and promotion.

2002)(emphasizing the level of severity to which actions must rise in order to create a hostile

work environment); *cf. Munday*, 126 F.3d at 243-44 (difficult or unpleasant working conditions

such as being ignored by supervisor and co-workers are not so intolerable as to compel a

reasonable person to resign).  Moreover, the only occurrences that could potentially raise an

inference that the harassment was based on his race – the alleged racial slurs – are completely

unsubstantiated and inadequate.[22]  Carter's hostile work environment claim must fail.

      Based on the foregoing, the motion for summary judgment will be granted.

      A separate order follows.


    May 31, 2006                                 /s/

Date                                            Catherine C. Blake

                                            United States District Judge

---

[22] Not only does Carter fail to identify specific occurrences of, or individuals responsible for, these alleged slurs, he does not even provide an account of the substance thereof. (*See* Def's Mot. for Summ. J., Exhibit 1, Carter Depo. at 1057-59)  Moreover, with respect to the comment that Carter "is interested in colors," while possibly indicating that the speaker thought race was on Carter's mind, such a comment is insufficient to create an inference of discrimination, much less a hostile environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998)(citing multiple cases for proposition that mere utterances of an ethnic or racial epithet which engenders offensive feelings in an employee do not sufficiently alter terms and conditions of employment).